UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KEVIN HELDE, JOHN BODILY, and MAX TENA, on their own behalf and on the behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>KNIGHT TRANSPORTATION INC., an Arizona Corporation,<br><br>        Defendant. | No. 2:12-cv-00904 RSL<br><br>**DECLARATION OF KEVIN QUAST IN SUPPORT OF DEFENDANT KNIGHT TRANSPORTATION, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

I, Kevin Quast, hereby declare as follows:

1.      I am currently Chief Operations Officer for Knight Transportation, and I submit this declaration in support of Defendant Knight Transportation, Inc.'s Motion for Partial Summary Judgment. I have personal knowledge of the facts contained in this declaration, and I am competent to testify as to those facts.

2.      Knight is an interstate trucking company, headquartered in Phoenix, Arizona, which provides services throughout the United States. Knight has service centers across the country. Knight's service center in Washington was in Tukwila until August 2010 and in Kent from August 2010 to July 2012. Starting July 2012, Knight Transportation consolidated its

DECLARATION OF KEVIN QUAST IN SUPPORT
OF DEFENDANT KNIGHT TRANSPORTATION,
INC.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - 1
No. 2:12-cv-00904 RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1   Washington-based operations with Knight's Portland's terminal, including transferring all

2   Knight drivers who were previously Washington-based to the Portland terminal and moving all

3   managers, dispatchers and planners responsible for the formerly Washington-based drivers to

4   the Portland terminal (in Fairview, Oregon). Knight no longer has a service center in

5   Washington but maintains a drop lot in Kent. Knight's records reflect the change of base

6   terminal from Tukwila/Kent to Fairview for the formerly Washington-based drivers. Although

7   Knight still recruits applicants from Washington, drivers hired after July 2012 for Knight

8   Transportation are not dispatched or supervised from Washington and are not considered by

9   Knight to be Washington-based drivers. Knight's records also do not identify drivers hired after

10   July 2012 as based in Tukwila or Kent. Thus, Knight currently does not have any Washington-

11   based drivers.

12       3.     I have been employed by Knight since 1996, first working as a driver recruiter,

13   then as a human resources manager, then as a General Manager, and currently as Chief

14   Operations Officer, a position I have held for the past two years. As Chief Operations Officer, I

15   have personal knowledge of Knight's daily interstate operations, including where Knight

16   operates its trucks and how they are operated; Knight's costs associated with operating its fleet;

17   and the services Knight provides to its customers and the price for those services. In addition,

18   based on my experience working at Knight as a driver recruiter, human resources manager,

19   General Manager, and Chief Operations Officer, I have personal knowledge of how Knight

20   advertises job postings for drivers both in Washington and throughout the country, Knight's

21   orientation program for driver applicants, and how Knight compensates its over-the-road

22   drivers.

23       **Advertising**

24       4.     Knight uses various media to advertise open positions for truck drivers. Knight

25   places advertisements on websites such as www.craigslist.com, in newspapers, and in

26   pamphlets that are placed in truck stops nationwide. In these advertisements, Knight includes

DECLARATION OF KEVIN QUAST IN SUPPORT
OF DEFENDANT KNIGHT TRANSPORTATION,
INC.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - 2
No. 2:12-cv-00904 RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1   information such as how much time drivers might spend at home, Knight's equipment, types of

2   trucks, and the availability of daily or weekly pay. Knight does not usually advertise specific

3   mileage pay rates or state that drivers will be paid for all miles actually driven.

4   **Orientation**

5   5.      Knight only hires experienced drivers. If an applicant has the requisite

6   experience and is not otherwise disqualified from driving a truck for Knight, Knight invites the

7   applicant to attend an orientation. Knight informs the applicant that several Department of

8   Transportation ("DOT") required tests will be administered during the orientation and that the

9   applicant has to successfully complete the orientation, including passing the required tests, in

10  order to be offered employment as a truck driver by Knight.

11  6.      Rather than receive any benefit from the applicants during orientation, Knight

12  incurs substantial costs on behalf of each applicant, totaling a minimum of several hundred

13  dollars per applicant. This includes the cost of food, transportation, and lodging for applicants.

14  This also includes the costs for the DOT-required tests and the cost of the time spent by Knight

15  employees conducting the orientation.

16  **Compensation**

17  7.      Like most other interstate motor carriers, Knight's compensation system for its

18  over–the–road drivers has two components: (1) a fixed-amount payment for the hauling and

19  delivery of a load, including all routine non–driving duties associated with the hauling and

20  delivery of a load (which fixed amount payment is known to a driver before he agrees to accept

21  the load); and (2) additional payment for certain extra duties that may be required in connection

22  with the hauling and delivery of the load.

23  8.      The fixed-amount trip pay component is determined in the following manner.

24  Knight Transportation uses a sliding pay scale that is determined by factors including the length

25  of the haul (calculated by Rand McNally software and based on the distance between the

26  middle of the zip code of the pick-up location and the middle of the zip code of the delivery

DECLARATION OF KEVIN QUAST IN SUPPORT
OF DEFENDANT KNIGHT TRANSPORTATION,
INC.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - 3
No. 2:12-cv-00904 RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

location) and the driver's base per-mile rate, which varies depending on level of experience, the driver's performance, and length of the trip. All routine duties associated with the hauling and delivery of a load are included in the per-mile rate and so are included in the fixed amount for a trip. Routine duties include: weighing loads; filling out paperwork; conducting vehicle inspections; securing and caring for cargo; performing maintenance activities; fueling; washing the truck; up to two hours of detention time at the consignee; and any other work necessary to enable a driver to perform his or her driving duties. Knight's drivers can make up to $0.41/mile, and, in some instances, even more.

9. Drivers are paid an extra amount for certain additional duties that may be required in connection with the delivery of a load, including: extra stops or pickups; hand loading/unloading; hazardous material transport; detention at a consignee for more than two hours; layover pay; congestion pay; and border crossings.[1]

10. All drivers are provided a copy of the Driver Manual. I am familiar with the Driver Manual and have reviewed it on multiple occasions. Attached hereto as Exhibit A are true and correct copies of relevant excerpts from Knight's Driver Manual that was in effect during the proposed class period, including those pages relating to mileage pay and extra pay.

11. Attached hereto as Exhibit B is a true and correct copy of relevant excerpts of the payroll section of Knight's PowerPoint presentation. Attached hereto as Exhibit C is a true and correct copy of relevant excerpts of the payroll section of Knight's online orientation relating to mileage pay and extra pay. These materials were provided to Knight's service centers at different times during the class period to use at their discretion in explaining Knight's compensation structure to driver applicants during orientation. I am familiar with the PowerPoint presentation and online orientation materials, and have reviewed them on multiple occasions.

12. Knight's compensation system, whereby the fixed-amount compensation for the

---

[1] Hourly drivers would not be paid additional pay on top of their hourly pay for these tasks.

DECLARATION OF KEVIN QUAST IN SUPPORT
OF DEFENDANT KNIGHT TRANSPORTATION,
INC.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - 4
No. 2:12-cv-00904 RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA 98104-7044 | Tel: 206.839.4800

1   load includes all routine duties in hauling a load, is the norm in the interstate trucking industry.

2       13.     If a trip is less than 50 miles, Knight pays its drivers by the hour for all time

3   worked, from the time they perform the pre-trip inspection until they perform the post-trip

4   inspection after they are finished for the day. Knight's drivers are paid an hourly rate of $12.00

5   per hour for these local trips.

6       14.     Prior to each trip, a driver is presented with a pre-plan proposal via the on-board

7   computer system that provides information concerning the load, including the Rand McNally

8   mileage calculation for the trip and whether extra duties such as extra stops will be required. A

9   driver is then able to determine before accepting a load, precisely what his pay will be for that

10  assignment by multiplying his or her base rate by the number of miles indicated in the load

11  proposal and adding in the compensation for any extra tasks. Drivers can accept the pre-plan

12  proposal, or they may reject it and wait for a more preferable load. If a driver accepts a load

13  proposal, then he is paid according to the proposal once the delivery is completed and the

14  driver transmits the trip paperwork to Knight. For drivers paid on a weekly pay schedule, the

15  cutoff for submission of trip paperwork is Tuesday at 10 a.m. Phoenix time. For drivers paid on

16  a daily pay schedule, the cutoff for submission of trip paperwork is 10 a.m. Phoenix time,

17  Monday through Friday.

18      **Payroll Card**

19      15.     Knight offers drivers two separate options to receive their pay—direct deposit or

20  payroll card. Drivers are informed of both of these options as part of Knight's orientation.

21  Drivers are also informed during orientation that they have the option to put all or a percentage

22  of their wages onto their payroll card, with the remainder being paid through direct deposit.

23  Drivers complete a form signifying their election to receive their pay by direct deposit, payroll

24  card, or a combination of the two.

25      16.     Payroll cards work like a debit card. During the initial part of the proposed class

26  period, Comdata was the company that issued drivers their payroll card; towards the end of

DECLARATION OF KEVIN QUAST IN SUPPORT
OF DEFENDANT KNIGHT TRANSPORTATION,
INC.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - 5
No. 2:12-cv-00904 RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1   2011 and early 2012, the company that issued drivers their payroll card was Transportation

2   Clearing House, LLC ("TCH"). Attached hereto as Exhibit D is a true and correct copy of a

3   flyer that was distributed to all of Knight's drivers when Knight switched to TCH. I have

4   access to this business record as Chief Operations Officer.

5       17.    Drivers can withdraw all their wages from these payroll cards without incurring

6   any fees. Each time after a driver's pay is deposited onto the payroll card, the driver can

7   withdraw all the funds from numerous fuel stations or transfer the funds into a bank account

8   without incurring any fees. Drivers may also make point-of-sale purchases with their payroll

9   card without incurring any fees.

10      18.    Because payroll cards work as debit cards, they are subject to vendor and ATM

11  fees. Therefore, just as with any debit card, certain ATMs charge drivers fees for withdrawing

12  funds from their payroll cards. In addition, Comdata and TCH could charge drivers other fees,

13  depending on the type and number of transactions they engage in. On the other hand, direct

14  deposit does not involve any vendor or ATM–related charges.

15      19.    Knight does not deduct or withhold wages from drivers for their use of the

16  payroll card to withdraw funds, nor does it charge drivers any fees to use the payroll card.

17  Knight did not and does not receive any benefits from the charges made by Comdata and TCH

18  or the operators of the ATMs that drivers use to access their pay.

19      20.    Attached hereto as Exhibit E is a true and correct copy of a pay history inquiry

20  report for Kevin Helde. Knight keeps these pay records in the ordinary course of business, and I

21  requested that these records be pulled for my review. My review of these records shows that all

22  of Kevin Helde's wages were paid via direct deposit.

23  **Recording of All Hours Worked**

24      21.    Knight and its drivers must comply with the Federal Motor Carrier Safety

25  Administration's Hours of Service ("HOS") regulations. The HOS regulations require drivers

26  to record their HOS daily on driver logs by listing the activity and the time spent performing

DECLARATION OF KEVIN QUAST IN SUPPORT
OF DEFENDANT KNIGHT TRANSPORTATION,
INC.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - 6
No. 2:12-cv-00904 RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA 98104-7044 | Tel: 206.839.4800

1  each activity. The activities recorded on the driver logs are limited to "Off Duty," "Driving,"

2  "On Duty (Not Driving)," and "Sleeper Berth."

3      22.    The time a driver spends at the driving controls of a truck that is in operation is

4  logged as "Driving" time in the log. The time a driver spends performing work, except driving,

5  or spends being ready to perform work is logged as "On Duty (Not Driving)" in the log. "On

6  Duty (Not Driving)" time includes preparing for and conducting pre–trip and post–trip

7  inspections, loading or unloading a truck, weighing loads, securing and caring for cargo,

8  fueling, taking drug or alcohol tests, being at an accident scene, interacting with and providing

9  services to a customer, filling out paperwork, performing maintenance activities, washing the

10  truck, detention time at the consignee, extra stops and pickups, extra duties associated with

11  transporting hazardous material, and any other work necessary to enable a driver to perform his

12  or her driving duties. The "Sleeper Berth" designation in the log is used to record time spent in

13  the sleeper berth, and "Off Duty" is used to record time when a driver has been relieved of all

14  duty, including responsibility for equipment and loads.

15      23.    Because Knight requires its drivers to record in their logbooks time spent

16  driving (by using the "Driving" designation) and performing any and all other work for Knight

17  related to the drivers' job duties (by using the "On Duty (Not Driving)" designation), these

18  logbooks reflect all hours worked by Knight's drivers. Any time spent not performing work,

19  such as "Sleeper Berth" or "Off Duty" time, is also reflected in the logbooks.

20      24.    Knight requires its drivers, under the HOS regulations, to record their activity

21  daily using the four aforementioned designations. Daily recordation is a must because the HOS

22  regulations limit how much time a driver can work per day and per week. For example, a driver

23  may only drive a maximum of 11 hours in a day; a driver may only be on duty for a maximum

24  of 14 hours in a day (including no more than 11 hours of actual driving) and may not drive past

25  the 14th consecutive hour after coming on duty, following 10 consecutive hours off duty; and a

26  driver may not drive after 60/70 hours on duty in 7/8 consecutive days.

DECLARATION OF KEVIN QUAST IN SUPPORT
OF DEFENDANT KNIGHT TRANSPORTATION,
INC.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - 7
No. 2:12-cv-00904 RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

**Meal and Rest Breaks**

25.     Because the HOS regulations allow for a minimum of three hours of "On Duty Not Driving" for every 14 hours worked, with no restrictions on when such non-driving time occurs, the HOS regulations afford Knight and its drivers flexibility in scheduling work activities. For example, a driver has the option to plan where he or she would like to take a meal or rest break, regardless of whether he or she has been driving one hour or three hours. Knight can also schedule appropriate delivery windows in advance for customers, knowing that the driver has the flexibility to take a break before the scheduled delivery or decide, at his discretion, to postpone the break until after the delivery is made.

26.     Most importantly, drivers are informed that safety is the number one priority, so if they need to take a break, they should take a break regardless of whether they have been driving one hour or five hours. Respecting drivers' abilities to know best when they need to take breaks, Knight does not tell its drivers when to take breaks. Knight does not discourage its drivers from taking breaks.

27.     Drivers cannot stop their trucks just anywhere in order to take a break. First, a driver must find a suitable place to park the truck; a driver cannot simply pull over to the side of the road or highway. Knight has a "Sitting Duck Policy," outlined in its Driving Manual that is made available to drivers during orientation, that prohibits drivers from parking or stopping along the side of any roadway (unless the truck is completely broken down and cannot be moved). Parking along the side of a road presents a deadly hazard. Knight summarily dismisses any driver who parks or stops along the side of a road for a non-emergency reason. Because a driver cannot simply stop at the side of a road, he or she must drive to the next rest stop or exit the highway to find a suitable truck stop or rest stop that can accommodate Knight's trucks, and a 53-foot trailer. Finding a suitable rest stop takes additional time, and additional miles.

28.     After finding a suitable place to stop, a driver then has to park the truck. Drivers are encouraged to park in such a way that they will be able to pull forward when leaving.

DECLARATION OF KEVIN QUAST IN SUPPORT
OF DEFENDANT KNIGHT TRANSPORTATION,
INC.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - 8
No. 2:12-cv-00904 RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA 98104-7044 | Tel: 206.839.4800

1   Backing the truck up against a wall (thus allowing the driver to pull forward when leaving) also

2   helps prevent cargo theft. Maneuvering a truck with a 53-foot trailer in such a way is difficult.

3   After parking the truck, the driver has to disable the tractor and secure the tractor-trailer. This

4   process of exiting the highway and traveling to a suitable rest stop, maneuvering the truck to

5   properly park, disabling and securing the truck, then re-entering the highway can take about 30

6   minutes.

7       29.    If a driver were to follow Washington's meal-and-rest-break laws, he would

8   have to use a limited number of routes that allow him to take breaks at definite times (as stated

9   by Washington's laws). Following such limited routes, which would allow drivers to take

10  breaks at appointed times, would compromise the timeliness of customers' deliveries.

11      30.    Requiring drivers to take breaks at defined times throughout a workday would

12  also significantly impact Knight's operations in a number of different ways.

13      31.    First, Knight's fuel costs would be adversely impacted in two ways.

14          a.  For one, Knight's trucks burn fuel, on average, at the rate of about six

15              miles per gallon but burn more when starting and stopping. Making

16              additional stops, and driving the distances needed to take the breaks,

17              would result in drivers burning an additional 2–3 gallons of fuel per day.

18              Because Knight had about 80 Washington-based drivers operating on

19              any given day during portions of the class period, the annual additional

20              cost of fuel would increase by $1–1.5 million.

21          b.  Knight also has agreements with certain truck stops throughout the

22              country that typically provide Knight with a volume discount. As a

23              result, Knight encourages drivers to plan their routes to take advantage of

24              fueling at these truck stops that offer discounts. When a driver has to use

25              a truck stop that does not have an agreement with Knight to get fuel,

26              Knight will almost always pay a higher price for fuel.

DECLARATION OF KEVIN QUAST IN SUPPORT            DLA Piper LLP (US)
OF DEFENDANT KNIGHT TRANSPORTATION,              701 Fifth Avenue, Suite 7000
INC.'S MOTION FOR PARTIAL SUMMARY            Seattle, WA 98104-7044 | Tel: 206.839.4800
JUDGMENT - 9
No. 2:12-cv-00904 RSL

32.     Second, Knight's labor cost would increase. If Knight is required to provide relief personnel throughout Washington to ensure drivers receive a break (and not compromise the timeliness of customer deliveries), labor costs would rise dramatically. Such a requirement would force Knight to have sufficient personnel throughout Washington who could be dispatched to relieve the drivers. Moreover, these personnel would need transportation to get to these drivers, and thus Knight would have to purchase additional equipment for the relief drivers.

33.     Third, maintenance costs would increase. Starting and stopping driving causes additional wear and tear on vehicles.

34.     Fourth, having to comply with Washington's meal-and-rest-break laws would affect the services Knight provides to its customers by reducing the amount of productive work time drivers have under the HOS regulations and thus would reduce the level of services Knight is able to provide. Many customers require deliveries to be made at particular times. Delivery times would be impacted by the driver's need, under Washington's scheme, to take a break. A driver may thus be unable to provide services at the appointed time. Some of Knight's customers also have contracts with Knight whereby Knight provides routine scheduled deliveries and pickups. Imposing Washington's meal-and-rest-breaks regime would cut into drivers' driving times and make it difficult for these drivers to make these routine, scheduled deliveries. Such customers, who are not necessarily based in Washington, would have to alter their businesses in order to accommodate drivers who transport goods through Washington, if the drivers had to adhere to Washington's meal-and-rest-break laws.

35.     As set forth above, requiring Knight and its drivers to comply with Washington's meal-and-rest-break laws would (a) increase Knight's costs and(b) reduce services to its customers and limit the routes drivers could take. Knight's rates could increase: Knight would have to increase rates charged to customers to cover for the additional costs incurred (lest Knight operate at a loss).

DECLARATION OF KEVIN QUAST IN SUPPORT
OF DEFENDANT KNIGHT TRANSPORTATION,
INC.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - 10
No. 2:12-cv-00904 RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

**Reasonable Equivalence**

36.     On January 19, 2009, Knight submitted a request to the Washington State Department of Labor and Industries ("L&I") for approval of Knight's pay structure for Washington interstate truck drivers. Knight submitted additional information to L&I during 2009 and early 2010. As Chief Operations Officer, I have access to Knight's business records, including Knight's correspondence with L&I.

37.     Attached hereto as Exhibit F is a true and correct copy of Knight's January 19, 2009 request to L&I. Attached hereto as Exhibit G is a true and correct copy of Knight's March 4, 2010 letter to L&I submitting additional documentation, without exhibits. Attached hereto as Exhibit H is a true and correct copy of the L&I's March 17, 2011 response to Knight's request.

38.     Although Knight's pay rates have changed since 2009, Knight's pay structure has not changed.

**Knight Port Services**

39.     Knight Port Services is a separate corporate entity from Knight Transportation, Inc. Washington-based Knight Port Services drivers' pay is not based in any way on mileage,[2] and has not been based in any way on mileage at any time from when it began operations in Washington in 2010 to present.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Phoenix, Arizona on March 21, 2013.

Kevin Quast

---

[2] This excludes a few Knight Port Services owner operators, who are not Knight Port Services employees.

DECLARATION OF KEVIN QUAST IN SUPPORT
OF DEFENDANT KNIGHT TRANSPORTATION,
INC.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - 11
No. 2:12-cv-00904 RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA 98104-7044 | Tel: 206.839.4800

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on March 21, 2013, I electronically filed the foregoing with the

3  Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4  attorneys of record for the parties.

5      Dated this 21st day of March, 2013.

6

7                          /s/ Stellman Keehnel
                           Stellman Keehnel, WSBA No. 9309

8

9

10  WEST\240647192.1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF KEVIN QUAST IN SUPPORT              DLA Piper LLP (US)
OF DEFENDANT KNIGHT TRANSPORTATION,            701 Fifth Avenue, Suite 7000
INC.'S MOTION FOR PARTIAL SUMMARY        Seattle, WA  98104-7044 | Tel: 206.839.4800
JUDGMENT - 12
No. 2:12-cv-00904 RSL