UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                        )
KEVIN HELDE, *et al.*,                  )   No. C12-0904RSL
                                        )
                    Plaintiffs,         )
        v.                              )
                                        )   ORDER GRANTING IN PART
KNIGHT TRANSPORTATION, INC.             )   DEFENDANT'S MOTION FOR
                                        )   SUMMARY JUDGMENT
                    Defendant.          )
_____)

This matter comes before the Court on "Defendant Knight Transportation, Inc.'s Motion for Partial Summary Judgment." Dkt. # 51. Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact that would preclude the entry of judgment as a matter of law. L.A. Printex Indus., Inc. v. Aeropostale, Inc., 676 F.3d 841, 846 (9th Cir. 2012). The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and identifying those portions of the materials in the record that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)(1)).  Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to identify specific factual disputes that must be resolved at trial. Hexcel Corp. v. Ineos Polymers, Inc., 681 F.3d 1055, 1059 (9th Cir. 2012). The mere existence of a scintilla of evidence in support of the non-moving party's position will

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

not preclude summary judgment, however, unless a reasonable jury viewing the evidence in the light most favorable to the non-moving party could return a verdict in its favor. U.S. v. Arango, 670 F.3d 988, 992 (9th Cir. 2012).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties and having heard the arguments of counsel, the Court finds as follows:

### A. Preemption of Rest Break Claims

Defendant argues that plaintiff's first, second, and fourth claims for relief are preempted by the Federal Aviation Administration Authorization Act ("the FAAAA"), 49 U.S.C. § 14501(c)(1), which prohibits states from regulating the price, routes, and/or services offered by motor carriers. Washington's rest break law provides:

> Employees shall be allowed a rest period of not less than 10 minutes, on the employer's time, for each 4 hours of working time. Rest periods shall be scheduled as near as possible to the midpoint of the work period. No employee shall be required to work more than three hours without a rest period.

WAC 296-126-092(4).[1] In the alternative, defendant argues that Washington's rest break regulations impermissibly conflict with the federal Hours of Service ("HOS") regulations which set uniform maximums for drivers. 49 C.F.R. § 395.3.

The party urging preemption has the burden of establishing that the defense applies. Jimeno v. Mobil Oil Corp., 66 F.3d 1514, 1526 n.6 (9th Cir. 1995).[2] The FAAAA prohibits states from enacting or enforcing "a law, regulation, or other provision having the force

---

[1] Plaintiffs have abandoned their claim that they were entitled to meal breaks under a different subsection of WAC 296-126-092.

[2] "In determining whether preemption exists, the purpose of Congress is the ultimate touchstone." In re Thorpe Insulation Co., 677 F.3d 869, 889 (9th Cir. 2012) (internal quotation marks omitted). Because states have historically possessed "broad authority under their police powers to regulate the employment relationship to protect workers" (DeCanas v. Bica, 424 U.S. 351, 357 (1976) (superseded by statute on other grounds)), defendant "bears the considerable burden of overcoming the starting presumption that Congress did not intend to supplant state law" (De Buono v. NYSA-ILA Med. & Clinical Servs. Fund, 520 U.S. 806, 814 (1997)).

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT            -2-

and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). The Act does not expressly preempt state wage laws in general or rest break laws in particular. Nevertheless, preemption "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992).

The FAAAA, like the Airline Deregulation Act before it, was enacted to promote "maximum reliance on competitive market forces" in establishing prices, routes and services in the transportation industry. Rowe v. N.H. Motor Transp. Ass'n, 552 U.S. 364, 367-68, 371 (2008) (quoting 49 U.S.C. App. § 1302(a)(4) (1988 ed.)). State laws and regulations that curbed or thwarted competitive market forces were deemed impediments to innovation, efficiency, variety, lower prices, and better service. Thus, Congress included preemption provisions in the statutes in order to "ensure that the States would not undo federal deregulation with regulation of their own." Morales, 504 U.S. at 378; Rowe, 552 U.S. at 368. Given the purpose and language of the FAAAA preemption provision, the Ninth Circuit has found that preemption is appropriate when the state law or regulation, "directly or indirectly, binds the carrier to a particular price, route or service and thereby interferes with competitive market forces within the industry." Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 660 F.3d 384, 397 (9th Cir. 2011) (internal quotation marks and ellipses omitted) (rev'd on other grounds, 133 S. Ct. 2096 (2013)). Regulations of general applicability that have a remote or tenuous effect on the price, routes, or services offered by a motor carrier are not preempted. Dan's City Used Cars, Inc. v. Pelkey, __ U.S. __, 133 S. Ct. 1769, 1778 (2013); Tillison v. Gregoire, 424 F.3d 1093, 1099 (9th Cir. 2005).

In Californians for Safe and Competitive Dump Truck Transp. v. Mendonca, 152 F.3d 1184, 1188 (9th Cir. 1998), the Ninth Circuit determined that California's prevailing wage law was not preempted by the FAAAA. Plaintiff in that case argued that the state's requirement

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT        -3-

1   that it pay employees "not less than the general prevailing rate" increased its costs, thereby
2   forcing it to raise prices by 25% and to reroute equipment in an effort to reduce expenditures.
3   The Ninth Circuit acknowledged these impacts, but declined to equate a mere causal relationship
4   with "related to" for purposes of the FAAAA.  The court found that (a) the prevailing wage law
5   did not fall into the field of laws related to pricing, routes, and services and (b) the law would
6   not "frustrate[] the purpose of deregulation by *acutely* interfering with the forces of competition"
7   in the industry.  152 F.3d at 1189 (emphasis in original).  It therefore concluded that any effect
8   the law had on prices, routes, and services was too indirect, remote, and tenuous to trigger
9   preemption.

10              While it is clear that, after Mendonca, general wage laws are not preempted by the
11  FAAAA, the fate of meal and rest break requirements has varied.  The majority of district courts
12  that have addressed the issue find that the imposition of scheduled breaks throughout the day
13  affects the routes a motor carrier can choose, the scheduling of service, and/or the prices
14  charged.  See Miller v. Southwest Airlines, Co., 923 F. Supp.2d 1206, 1212-13 (N.D. Cal. 2013)
15  (applying preemption provision of Airline Deregulation Act); Cole v. CRST, Inc., 2012 WL
16  4479237, at *4 (C.D. Cal. Sept. 27, 2012); Jasper v. C.R. England, Inc., 2012 WL 7051321, at
17  *7 (C.D. Cal. Aug. 30, 2012); Campbell v. Vitran Express, Inc., 2012 WL 2317233, at *4 (C.D.
18  Cal. June 8, 2012); Aguiar v. Cal. Sierra Express, Inc., 2012 WL 1593202, at *1 (E.D. Cal. May
19  4, 2012); Esquivel v. Vistar Corp., 2012 WL 516094, at *5 (C.D. Cal. Feb. 8, 2012); Dilts v.
20  Penske Logistics LLC, 819 F. Supp.2d 1109, 1118-19 (S.D. Cal. 2011).  Dilts and Campbell are
21  currently on appeal to the Ninth Circuit.  Two district courts have found that preemption does
22  not apply.  See Mendez v. R&L Carriers, Inc., 2012 WL 5868973, at * 6 (N.D. Cal. Nov. 19,
23  2012); Dunbar Armored, Inc. v. Rea, C04-0602WQH (S.D. Cal. July 8, 2004).  These cases are
24  based primarily on the fact that California's meal and rest break law allows employers to forego
25  meal and rest breaks in favor of paying the employee an additional hour of wages per day,
26

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT              -4-

thereby avoiding any potential impact the law would otherwise have on rates or services. Washington's law does not contain a similar provision. Finally, two courts have determined that further factual development was necessary before the impact of the meal and rest break statute on the carrier's prices, service, and routes could be determined. See Reinhardt v. Gemini Motor Transp., 869 F. Supp.2d 1158, 1166 (E.D. Cal. 2012); Cardenas v. FoodServices, Inc., 796 F. Supp.2d 1246, 1255-56 (C.D. Cal. 2011).

In order to determine whether Washington's rest break requirement "relate[s] to a price, route, or service of any motor carrier" for purposes of 49 U.S.C. § 14501(c)(1), the Court "must examine the actual or likely effect of" the requirement. Am. Trucking, 660 F.3d at 396. In close cases where the law will have an impact on a carrier's prices, routes, and services even though the state has not attempted to regulate the carrier's operations directly, the proper inquiry is whether the regulation binds carriers to particular prices, routes, or services, thereby interfering with the industry's competitive market forces. Id. at 396-97. State interference with market forces in the trucking industry is forbidden, but the FAAAA does not preclude states from enforcing laws of general applicability that have only a tenuous or remote effect on the market.

Defendant has provided evidence in the form of its Chief Operations Officer's declaration regarding the impact of requiring rest periods for each four hours of working time, scheduled "as near as possible to the midpoint of the work period." WAC 296-126-092(4). Mr. Quast states that compelling the rest breaks would (a) increase Knight's costs, (b) reduce services to customers, and (c) limit the routes drivers could take. Decl. of Kevin Quast (Dkt. # 57) at ¶ 35. The first impact is irrelevant. The issue is whether the services offered, prices charged, or routes traversed by defendant would have to be altered to comply with the state's regulation. The fact that defendant's costs will increase, even with the attendant possibility that defendant might choose to pass those costs along to consumers, does not mean that the

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT         -5-

regulation binds defendant to particular prices.  See Air Transport Ass'n of Am. v. City and County of San Francisco, 266 F.3d 1064, 1072-73 (9th Cir. 2001) (although the anti-discrimination ordinance would increase costs, the airlines retained the freedom "to set whatever terms, conditions and prices they want" and failed to prove that the ordinance would compel or coerce them to change their routes or services); Mendonca, 152 F.3d at 1189 (increase in prices of 25% related to requirement that contractors pay the prevailing wage is merely an indirect, remote, and tenuous effect of the regulation that does not "frustrate[] the purpose of deregulation by *acutely* interfering with the forces of competition.")(emphasis in original).

Defendant argues that enforcing the rest break regulation would compel changes in the services it offers its customers.  Services, for purposes of the FAAAA, "refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided."  Air Transport Ass'n, 266 F.3d at 1071.  Mr. Quast states that each required rest break would reduce a driver's productive time by approximately thirty minutes given the need to find a suitable stopping place, to safely park and secure the tractor and trailer, and to return to the original route.  Decl. of Kevin Quast (Dkt. # 57) at ¶¶ 27-28.  Defendant provided evidence that not only would this lost time impact the scheduled delivery time of long-haul shipments, but the driver would also be unavailable two or three times a day to do pickups and deliveries, limiting the schedule on which such services can be offered.  Decl. of Kevin Quast (Dkt. # 57) at ¶¶ 34.

Finally, Mr. Quast states that compliance with Washington's rest break regulation would limit the number of routes available to a driver because he or she would have to choose roads with suitable stopping points spaced along the route at distances compelled by the regulation.  Decl. of Kevin Quast (Dkt. # 57) at ¶ 29.  Although Mr. Quast discusses the need to find a suitable stopping place and the mechanics of parking, he provides no facts regarding the roads of Washington, the services provided on those roads, the routes currently utilized, or any changes that would be compelled by the regulation.  While the Court has no doubt that there are

roads that do not have services suitable for tractor-trailers, there is no evidence that defendant currently uses those routes or that WAC 296-126-092(4) would compel the carrier to either choose or abandon any specific route.

For all of the foregoing reasons, the Court finds that defendant has not met its burden of establishing that WAC 296-126-092(4) relates to a price or route of a motor carrier. The regulation does, however, relate to the services offered by the carrier because it directly impacts the schedule on which trucking services are performed by compelling mid-shift breaks within specified time frames.[3] The Court is therefore inclined to rule in defendant's favor on the preemption issue and must consider plaintiffs' request that it delay ruling until after the Ninth Circuit has decided the appeals in Dilts and Campbell. While the Court has the power to stay proceedings, a partial stay of only one issue while discovery and motion practice proceeds between the parties on the remaining claims would not promote efficiency or expedite the resolution of this litigation. The Court declines to stay consideration of this issue and finds that plaintiff's rest break claims are preempted by the FAAAA.

The Court need not determine whether the rest break regulations also conflict with the federal Hours of Service ("HOS") regulations.

**B. Unpaid Miles Claims**

Plaintiffs' first and second claims for relief are based in part on the claim that defendant failed to pay plaintiffs "for each mile driven." First Amended Complaint (Dkt. # 22) at ¶¶ 41 and 49. Defendant argues, however, that plaintiffs have no statutory or contractual guarantee to payment for actual miles driven, and that these claims must be dismissed because plaintiffs agreed to accept payment based on dispatch, rather than actual, miles.

---

[3] The Supreme Court recently made clear that the FAAAA preempts the enforcement of state laws only if the law relates to the "price, route, or service" of a motor carrier and concerns the carrier's "transportation of property." Dan's City Used Cars, Inc. v. Pelkey, __ U.S. __, 133 S. Ct. 1769, 1778-79 (2013). Both criteria are met here.

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          -7-

1  The wage laws provide flexibility in negotiating compensation systems, as long as
2 the employer pays its employees no less than the equivalent of the minimum wage rate for each
3 hour of work regardless of the system chosen.  WAC 296-128-550.  Defendant asserts, and
4 plaintiffs do not contest, that plaintiffs agreed to be compensated based on a combination of
5 dispatch miles and extra duty payments.  Plaintiffs have not alleged that defendant contracted to
6 pay them for each and every mile driven, nor have they identified a statute or regulation that
7 gives them a right to such payments.  Although plaintiffs may be able to show that the trip and
8 extra duty pay system under which they were employed resulted in hourly wages of less than the
9 statutory minimum or that defendants engaged in false or deceptive advertising, they have not
10 established a statutory or contractual right to pay "for each mile driven."

**C. Payroll Card Charges**

12  Plaintiffs have asserted a claim for relief regarding "unlawful deductions."  Dkt.
13 # 22 at ¶¶ 62-66.  In the First Amended Complaint, plaintiffs presented factual allegations to
14 support a claim that the use of payroll cards deprived plaintiffs of the full value of their wages.
15 Dkt. # 22 at ¶¶ 22-27.  Defendant, however, pointed out that none of the named plaintiffs had
16 opted to receive his wages through a payroll card, raising serious questions regarding their
17 standing to pursue the "full value" claim.  In response to the motion for summary judgment,
18 plaintiffs seem to have abandoned the "full value" claim in favor of a more general claim that
19 certain fees associated with the payroll cards were not authorized in writing by the employees, in
20 violation of WAC 296-126-028(2).  Dkt. # 71 at 18-19.  Defendant is entitled to summary
21 judgment to the extent plaintiffs claim that the use of the payroll cards, in and of itself, deprived
22 them of access to the full value of their wages.

23  Pursuant to WAC 296-126-028(2), "[d]uring an on-going employment
24 relationship, an employer may deduct wages when the employee expressly authorizes the
25 deduction in writing and in advance for a lawful purpose for the benefit of the employee.  These
26 deductions may reduce the employee's gross wages below the state minimum wage."  Defendant

argues, without any citations to case law or the governing regulations, that its deduction of amounts plaintiff Helde borrowed from defendant plus a $1.00 service fee charged by the payroll card vendor is not "a deduction from wages at all." Dkt. # 75 at 5-6. It is not clear what, in defendant's view, qualifies as a "deduction from wages" if not an itemized reduction in the amount of one's paycheck. To the extent defendant is relying on the fact that the deduction reflects a loan made to plaintiff Helde, pre-authorization is still required. WAC 296-126-028(2) expressly contemplates this exact situation and requires an employer who loans an employee money to obtain the employee's written agreement, in advance, to both the terms and method of repayment before it can recoup the funds through payroll deductions. Defendant has not shown that it is entitled to judgment on plaintiff's claim that the $1.00 payroll deductions associated with each loan violated Washington law.[4]

**D. Per Diem Plan**

Plaintiffs allege that defendant takes deductions of 2¢ per mile from their base pay rate under a "per diem plan" and that these deductions are not authorized in writing (in violation of WAC 296-126-028(2)) and work to the financial benefit of the employer (in violation of WAC 296-126-028(3)). Having reviewed the evidence, the Court finds that there is a fact issue regarding the nature of defendant's "per diem plan" that precludes summary judgment. There is evidence from which one could conclude that the per diem plan is actually a separate pay structure under which employees agree to accept 31¢ per mile – 2¢ less than they otherwise would have received – in exchange for avoiding the hassles of having to itemize hotel and meal costs on their annual tax return. If that were the case, the 2¢ difference in pay would reflect a different negotiated "regular rate of pay," and no deduction, authorized or unauthorized, would occur during the pay period. This is the conclusion drawn by the Circuit Court of the State of

---

[4] Whether defendant had any interest in or benefitted from the $1.00 deduction is irrelevant to the analysis under WAC 296-126-028(2). Deductions in which the employer has an interest are expressly precluded by WAC 296-126-028(3). A deduction need not violate both provisions in order to trigger liability.

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT         -9-

Oregon for the County of Multnomah in <u>Griffus v. Knight Transp., Inc.</u>, Case No. 1006-08538, on September 13, 2013.

Defendant's steadfast insistence that this is the appropriate characterization of the per diem plan is contradicted by significant evidence in the record, however.  One could reasonably conclude that, in fact, defendant pays its employees 33¢ per mile – the minimum pay rate advertised – unless they opt for the per diem plan, in which case it reduces the base, taxable pay by 13¢ per mile and gives back only 11¢ as untaxed per diem reimbursement.  The missing 2¢ are pocketed by defendant – the employees are told that the company takes the 2¢ to offset "lost tax benefits to the company."  Decl. of Toby J. Marshall (Dkt. # 72), Ex. 7 at DEF0000216.  <u>See</u> also <u>Id.</u>, Ex. 18 at DEF0002107 ("Per Diem wages are only 75% tax deductible for the company so the 2 cents helps to cover the company from losing tax money.").  Although the subtracting and adding of different amounts obscures the fact that a payroll deduction has been made, the jury could conclude that defendant has taken unauthorized deductions for its own benefit and has failed to openly and clearly record the deductions in violation of various state wage regulations.

**E.  Consumer Protection Act**

One of the elements of a Consumer Protection Act ("CPA") claim in Washington is that the unfair or deceptive act is causally connected to plaintiffs' injury.  <u>Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.</u>, 105 Wn.2d 778, 780 (1986).  Plaintiffs allege that defendant advertised a per mile pay rate that was higher than that actually paid, that plaintiffs reviewed the advertisements and accepted positions with defendant in reliance thereon, and that they were damaged by the reduction in pay rate.  Defendant asserts that, in fact, none of the named plaintiffs relied on the advertised pay rates when applying and that, if they did, any misstatements were corrected during orientation and before plaintiffs accepted their first driving assignment with defendant.

Taking the evidence in the light most favorable to plaintiffs, a reasonable factfinder could conclude that defendant's representations regarding rate of pay were material and affected plaintiff's decision to submit at application. Both Bodily and Tena stated that they reviewed advertisements that included defendant's per mile rate of pay and that they subsequently applied for a position with defendant. Neither plaintiff could remember, years later, the full extent of pay rate information contained in the advertisements, although Tena noted that you could make up to 41¢ per mile. Decl. of Stellman Keehnel (Dkt. # 56), Ex. A at 52:17-20. Although defense counsel avoided questioning plaintiffs regarding the impact this information had on their decisionmaking, it is reasonable to infer that, when looking for employment opportunities in a multi-employer environment such as line haul trucking, the effective pay rate would be a, if not the, material consideration.

Defendant offers no case law or principled argument in support of its contention that it can escape liability for the alleged false advertising by correcting the misrepresentation during orientation. By that time, plaintiffs had committed time and resources to the application and orientation processes and had abandoned their search for employment in order to pursue the allegedly fictitious benefits offered by defendant. Injury under the CPA includes time spent and expenses incurred in unwinding the deceptive and unfair statements. See Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 62 (2009); Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc., 64 Wn. App. 553, 563-64 (1992). If plaintiffs can prove that defendant advertised jobs paying 33¢ per mile and subsequently reduced that offer once it got people in the door, the factfinder could reasonably conclude that the alleged misrepresentations forced plaintiffs to choose between attempting to absorb the time and expenses incurred while they start the job search anew or accepting less than what was originally offered in order to get a paycheck. Either way, injury to business or property causally related to the misrepresentations may be shown.

Defendant has not shown that it is entitled to summary judgment on plaintiffs' CPA claim as a matter of law.

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT           -11-

### F. Orientation Pay

After a preliminary screening, defendant invites certain applicants to participate in an orientation. Although the details of the orientation have changed over time, it generally spans three days and a day of testing (physical, drug screen, road test), 6-8 hours of classroom or on-line training, and 6-8 hours of additional training, introduction to supervisor, and finalizing paperwork. Decl. of Toby J. Marshall (Dkt. # 72), Ex. 3 at 69:11 - 70:24; Ex. 17. Plaintiffs allege that the time spent at the mandatory, pre-employment orientation constitutes "hours worked" under the Washington Minimum Wage Act ("MWA") and that they are entitled to compensation. Defendant argues that plaintiffs were not employed at the time they participated in orientation and that the MWA does not apply.

"Employ" means "to permit to work" for purposes of the MWA. RCW 49.46.010(2). "Thus, the protections of the MWA are applicable [to plaintiffs] if, when they attended orientation, [d]efendant can be said to have permitted them to work." Seattle Prof'l Eng'g Emps. Ass'n ("SPEEA") v. Boeing Company, No. 92-2-29005-7, 1995 WL 17873923 (Sup. Ct. Wash. Oct. 17, 1995) (rev'd on other grounds, 139 Wn.2d 824 (2000)). The state Department of Labor and Industries ("DLI"), the agency charged with the administration and enforcement of the MWA, has concluded that the time an employee spends in training, lectures, or meetings is generally considered "hours worked" and must be compensated in accordance with the MWA. Interpretive Guideline No. ES.C.2, issue 3. That particular guideline presupposes the existence of an employee-employer relationship, however. Where an employment relationship exists, training time must be compensated unless the employer shows that attendance was voluntary, the employee performed no productive work, the training occurred outside normal working hours, and the training was not directly related to the employee's current job. Id.

As defendant points out, the issue in our case is whether an employment relationship exists in the first place. At the time of orientation, an offer of employment had not

yet been made, and plaintiffs had to successfully complete the testing and training in order to be hired. This situation is addressed in Interpretive Guideline No. ES.C.2, issue 4. In order to determine whether a trainee or intern satisfies the definition of "employee" (*i.e.*, has been permitted to work), DLI has adopted the six-factor test used by the U.S. Department of Labor:

If all of the following criteria are met, the trainees are not considered employees:

4.1  The training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school; and

4.2  The training is for the benefit of the trainee; and

4.3  The trainees do not displace regular employees, but work under their close observation; and

4.4  The business that provides the training derives no immediate advantage from the activities of the trainees, and may in fact be impeded; and

4.5  The trainees are not necessarily entitled to a job at the conclusion of the training period; and

4.6  The trainees understand that they are not entitled to wages for the time spent in the training.

Despite the clear statement that "all six" of the criteria must be met if the employer hopes to avoid the application of the MVA, courts have not been willing to adopt such an "all or nothing" approach, especially where the prefatory language of the guideline suggests that the determination must be made based on all of the surrounding circumstances. Interpretive Guideline No. ES.C.2, issue 4 ("Whether trainees are employees depends upon all of the circumstances surrounding their activities on the premises of the employer."); Reich v. Parker Fire Prot. Dist., 992 F.2d 1023, 1026-27 (10th Cir. 1993) (rejecting Secretary of Labor's strict application of the six-part test in similar circumstances). The only Washington state court to apply the six factors determined that they "should be taken as a guide in assessing all of the circumstances surrounding the activities in question." SPEEA, 1995 WL 17873923. The Court therefore addresses each of the six factors.

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT            -13-

### 4.1 The training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school

The topics covered at orientation were varied. Some are of the type that may be covered in vocational school or in any trucking company's orientation. Other topics, however, were Knight-specific. Although the witnesses were unable or unwilling to provide a percentage of the time dedicated to Knight-specific topics, a topic-by-topic breakdown of the PowerPoint presentation by number of slides and the time it takes to teach each topic shows that at least half of the 15 hrs and 45 minutes of training related to topics relevant to employment with Knight, as opposed to other trucking companies. Decl. of Toby J. Marshall (Dkt. # 72), Ex. 19. See also Id., Ex. 17 (Driving Associates Orientation Schedule setting aside only one hour for "Entry Level Training"). In addition, the time spent meeting supervisors and filling out employment forms was specific to Knight. The Court finds that the training was not, therefore "similar to that which would be given in a vocational school."

### 4.2 The training is for the benefit of the trainee

Some of the training, particularly the testing that would allow each applicant to qualify for employment with Knight, was for the benefit of the applicant. Once a basic level of proficiency were established, however, the focus of the orientation turned toward ensuring that the new hires would be prepared to start work immediately upon completing orientation. The second and third days of orientation involved training designed to ensure that the drivers had a basic understanding of the applicable regulatory and safety requirements, training regarding the ways and methods by which Knight does business, choosing amongst employment options, completing paperwork, and introducing supervisors to their new drivers. The Court finds that the training and activities in which applicants participated on days two and three were more for Knight's benefit than the drivers'.

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT           -14-

### 4.3 The trainees do not displace regular employees, but work under their close observation

There is no indication that plaintiffs conducted any of defendant's operations during orientation or that their presence in any way reduced the number of regular employees working a particular shift.

### 4.4 The business that provides the training derives no immediate advantage from the activities of the trainees, and may in fact be impeded

There is no indication that defendant gains immediate benefit from the orientation: it pays employees to conduct the training and expends funds to support applicants during the three-day process. Any benefit of the orientation accrues only after the drivers start working for Knight.

### 4.5 The trainees are not necessarily entitled to a job at the conclusion of the training period

The evidence on this point is equivocal. While it is clear that the applicants understand that they must pass the testing administered as part of the orientation in order to work for defendant, once that hurdle is passed, the assumption on both sides seems to be that a driver will be hired as long as he or she completes the orientation.

### 4.6 The trainees understand that they are not entitled to wages for the time spent in the training

The applicants are aware that they will be paid only a stipend and some expenses during orientation: there is no expectation of an hourly wage.

Given the totality of the circumstances, the Court finds that defendant did not permit plaintiffs to work when administering tests and assessing their basic proficiency for the job. With regards to the hours spent in training, filling in paperwork, and other on-boarding activities, however, that time is compensable under the MVA. Those activities were designed to make sure that individuals who proved their proficiency for the job would enter the workplace better prepared to participate in defendant's business. While some portion of the training

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT        -15-

covered regulatory and safety aspects of trucking in general, the majority of those hours appear to have been spent training applicants on how to be a Knight employee and/or filling in the paperwork to make it so. The primary benefit of these activities flowed, in the long-run, to defendant, and it can fairly be said that defendant permitted the applicants to work in order to obtain those benefits.

**G. Overtime Claims**

RCW 49.46.130(a) requires employers to pay its employees not less than one and one-half times their regular rate of pay for hours worked in excess of forty hours per week. Truck drivers who are subject to the provisions of the Federal Motor Carrier Act (such as plaintiffs here) may be paid under a compensation system that is not based on an hourly wage if the chosen compensation method is "reasonably equivalent" to a time-and-a-half pay structure in that it "compensates hours worked in excess of forty hours per week at an overtime rate of pay and distributes the projected overtime pay over the average number of hours projected to be worked." WAC 296-128-012(1)(a). Defendant has provided evidence that (a) its mileage-plus compensation system generally results in drivers being paid more than they would have received under an hourly rate plus time-and-a-half system (Decl. of Sonya Kwon (Dkt. # 55)) and (b) DLI has approved similar compensation systems as "reasonably equivalent" for purposes of RCW 49.46.130 (Decl. of Stellman Keehnel (Dkt. # 56), Exs. F and G). It therefore seeks summary judgment on plaintiffs' claims for overtime pay.

Plaintiffs argue that defendant's compensation system is fatally flawed because there was no additional compensation paid for hours in excess of forty. The laws and regulations of Washington allow truck drivers to be paid on a flat per mile basis, regardless of the number of hours worked in a week, as long as the amount paid per mile is reasonably calculated to include compensation for both straight time and time-and-a-half. Neither WAC 296-128-012 nor DLI require a separate, increased rate of pay or an additional stipend for overtime hours as long as the pay structure provides the reasonable equivalent of overtime pay.

Plaintiffs argue that defendant's equivalence analysis is invalid because there was no pre-established "base rate of pay" to give meaning to defendant's calculations and/or because defendant failed to account for the higher hourly rates paid to more experienced drivers. DLI has been willing to accept the hourly rate trucking companies pay their local or short-haul drivers as the "base rate of pay" for purposes of evaluating the reasonable equivalence of a proposed alternative compensation system. Decl. of Stellman Keehnel (Dkt. # 56), Exs. F and G. The evidence in the record shows that defendant pays its Washington drivers $12.00 per hour.[5] Plaintiff correctly points out that other trucking companies pay their local drivers at a rate commensurate with their years of experience – as does defendant in Nevada. There is nothing to prevent defendant from utilizing a single short-haul pay rate in Washington, however. In the absence of any evidence suggesting that an alternative "base rate" is appropriate in this case, a $12.00 rate is the appropriate starting point for the WAC 296-129-012 calculation. Given the calculations presented and DLI's willingness to accept similar compensation structures as reasonably equivalent under RCW 49.46.130, the Court finds that plaintiffs have failed to raise a genuine issue of fact regarding their overtime claims.

For all of the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part. Plaintiffs have abandoned their meal break claims, their rest break claims are preempted, and they have failed to raise genuine issues of fact regarding their statutory or contractual claims for unpaid miles and their overtime claims. Plaintiffs may proceed with their $1.00 payroll deduction claims, their 2¢ per diem deduction claims, their CPA claims, and their orientation claims.

---

[5] Defendant apparently pays up to $17.00/hour in Nevada for short-haul trucking services depending on the experience of the driver, but defendant's Chief Operations Officer states that Knight pays only $12.00/hour in Washington for trips under fifty miles. Decl. of Kevin Quast (Dkt. # 57-1) at ¶ 13. See also Dkt. # 57-3 at DEF0002045 (PowerPoint explanation of payroll setting local pay at $12 per hour in graphic and $12.50 per hour in text).

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT           -17-

Dated this 9th day of October, 2013.

/s/ Robert S. Lasnik
Robert S. Lasnik
United States District Judge